T. COLE POWELL and J. H. POWELL v. L. B. POWELL, J. R. BREWER and J. J. WILLIAMS, Appellants.

### Division Two, March 30, 1909.

1. **VENDOR'S LIEN: Assignment: Agreement to Collect: Revocation.** The owner of land sold it by warranty deed, reserving therein a vendor's lien. The purchase price not being paid, the vendor, by written instrument, assigned said vendor's lien, without consideration, to his sons, the plaintiffs, and afterwards stated to them that he thought he had given to them more than their share, and that they should collect the money, retain twenty per cent for their expenses, and divide the proceeds between themselves, and the assignment was placed in the hands of attorneys preparatory to bringing suit. Thereafter the same vendor made another written assignment to another son, a defendant, and also a quitclaim deed for a valuable consideration, and with notice, and this son represented to the attorneys that his father had directed him to call for the former assignment, and when it was delivered to him, he sold about one-half his interests in the lands to the other two defendants, and all brought suit on the vendor's lien for the deferred unpaid purchase money, obtained judgment, and at the sheriff's sale one of the other two bought the lands, but paid to the sheriff only the costs. These two defendants testified that they knew nothing of the prior assignment until after they had bought an interest in the subsequent one. *Held,* that if the first assignment to plaintiffs were simply a contract to collect it was revocable at any time, and was revoked by the subsequent assignment and quitclaim deed; but there is evidence that it was an executed assignment without condition, and the chancellor's finding that it was such will not be disturbed. *Held,* also, that the court properly vested in the prior assignees all the right, title and interest of the subsequent assignees in the former judgment.

Powell v. Powell.

2. ———: ———: **Innocent Subsequent Assignee.** An assignee in a subsequent assignment, with notice of a prior valid assignment, does not buy in good faith, and takes nothing by such assignment.

3. ———: **Suit by Subsequent Assignee: Knowledge of Former Assignee: Estoppel.** The fact that the first assignees of the vendor's lien knew of a subsequent assignment to defendants, but made no claim to the lands or any interest therein until after these subsequent assignees had obtained judgment against the vendee on his contract of purchase, does not estop them from seeking to appropriate said judgment to their own use. Not being parties to that suit, they did not cause the subsequent assignees to change their position, and did not in any way mislead them.

4. ———: **New Suit.** Where the subsequent assignees of a vendor's lien, under an invalid assignment, with notice of the prior assignment, seized upon and sold the land for the payment of the vendee's debt, the prior assignees under a valid assignment are not required to assert their rights against the land in a new and different suit against the vendee, but they may appropriate the judgment in favor of the subsequent assignees against the vendee.

5. ———: ———: **Appropriation of Judgment: Setting Aside Deed: Projecting Title Into Prior Assignee: Subrogation.** Where the subsequent assignee of a vendor's lien, with notice of a prior assignment, also obtains a quit-claim deed from the vendor, brings suit against the vendee for the amount of his debt, and obtains judgment, the court, in a suit by the prior assignee, to divest out of the subsequent assignee all his right, title and interest in that judgment and to vest the same in plaintiff, may set aside that quit-claim deed, and may give the prior assignee the full benefit of that judgment, and in doing so it does not project the title obtained by the subsequent assignee into the prior assignee, but simply holds the quit-claim deed for naught, and being a court of equity it exercises its powers to do complete justice and grant full relief. The question is not one of either legal or conventional subrogation.

6. ———: ———: ———: **Necessary Parties: Subsequent Purchasers From Vendee.** And the prior assignee's right to appropriate the judgment against the vendee and his grantee, in the suit brought against them by the subsequent invalid assignees, is not affected by the fact that such vendee and subsequent grantee are not made parties. It is of no consequence to the vendee or his grantee who has the right to collect the judgment on the vendor's lien.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort*, Judge.

AFFIRMED.

*J. R. Brewer* and *W. S. C. Walker* for appellants.

(1) The assignment of T. Cole Powell, Jr., and J. H. Powell by T. C. Powell, Sr., was merely for collection, and was therefore revocable, and was revoked. Burke v. Priest, 50 Mo. App. 310; Green v. Cole, 103 Mo. 70. (2) There was and is no warrant in law for the attempted subrogation of respondents herein to the rights of appellants herein, in and to the judgment obtained by appellants against Canaday. Subrogation is the substitution of one person in place of another, whether as a creditor or as the possessor of any other rightful claim, so that he is substituted to the rights of the other in relation to the debt or claim, and its rights, remedies or securities. 27 Am. and Eng. Ency. Law (2 Ed.), 202; Leavitt v. Railroad, 90 Me. 160; Jackson Co. v. Mutual Ins. Co., 139 Mass. 508. Subrogation is either legal, that is, given by law, or it arises out of conventions or contracts. Legal subrogation is allowed only in cases where the person advancing money to pay the debt of a third person stands in the situation of a surety, or is compelled to pay the debt to protect his own right. Conventional subrogation results from an agreement made either with the debtor or creditor that the person paying shall be subrogated. 27 Am. and Eng. Ency. Law (2 Ed.), 202; Bank v. Thompson, 61 N. J. E. 193.

*C. G. Shepard* and *Sam J. Corbett* for respondents.

(1) The first contention of appellants is that "the transaction between T. Cole Powell, Sr., and T. Cole Powell, Jr., and J. H. Powell, with reference to the

contract involving the vendor's lien amounted only to an agreement to have them collect said cause of action, and might be revoked, especially where no time limit had been agreed upon for them to hold said claim for collection.'' The above proposition is appellants' present theory of the case, and if the facts conformed to that theory, then we admit that their contention of right to revoke would be correct, but respondents most earnestly insist that the evidence in this case is all the other way. (2) The third contention of appellants is that ''respondents herein knew of that purchase, and made no claim to the lands or any interest therein until after appellants herein had obtained the judgment against Canady, on the contract. And now seek to appropriate that judgment to their own use.'' We take it that appellants mean to say that respondents have been guilty of such laches as to bar their right of recovery. In this we think learned counsel for appellants is wholly in error. The fact is, both T. C. Powell and J. H. Powell claimed to be the owner of this vendor's lien at the trial between these defendants and J. W. Canady. Then the defense that a claim is stale is purely an equitable one, and unless there is some natural justice back of it, a court of equity will not entertain it. Bucher v. Hohl, 199 Mo. 320; Haarstick v. Gabriel, 200 Mo. 237; St. Louis Deposit & S. Bank Co. v. Kennett Est., 101 Mo. App. 370. (3) Appellants' fourth contention is that ''if respondents have any title to, or interest in, that contract, or any right thereunder, they should assert them against the land in a suit against Canady and the others interested in said lands.'' These appellants had seized upon and sold this very land for the payment of this very debt; then why should Canady be harrassed further, or these respondents attempt the useless thing of trying to recover these lands until this proceeding was set aside? To remedy just such frauds as this is one of the main objects of a court of equity. Wadding-

ton v. Lane, 100 S. W. 1139; Fitzpatrick v. Stevens, 114 Mo. App. 497. (4) Courts of equity delight to do complete justice—they do not take two bites at one cherry. Harrison v. Craven, 188 Mo. 590; Hagan v. Bank, 182 Mo. 319; Baker v. McDanniels, 178 Mo. 447; Evans v. Railroad, 64 Mo. 462.

BURGESS, J.—This is a proceeding in equity, instituted in the circuit court of Pemiscot county, for the purpose mainly of divesting out of the defendants all of their right, title and interest in and to a certain judgment previously rendered in said circuit court, and investing the same in plaintiffs herein. Upon application for change of venue, the cause was transferred to the circuit court of Dunklin county, where trial was had and a decree entered in favor of plaintiffs, from which decree the defendants have prosecuted this appeal.

The facts developed at the trial of the cause are as follows:

T. C. Powell, father of plaintiffs T. Cole and J. H. Powell, and of defendant L. B. Powell, was owner of several large tracts of wild timber land in Pemiscot county, Missouri, and resided in Tennessee, just across the river from the city of Caruthersville, Pemiscot county, in which city lived his said three sons. On the 6th day of May, 1896, he and one J. W. Canady entered into a contract, in the nature of a warranty deed, by which he conveyed to said Canady lands owned by him in Pemiscot county, and described as the west half of section 13, all of section 14 except the north half of the northeast quarter, the north half of section 23, the east half of the southeast quarter of section 12, the northwest quarter of section 12, the north half of the northeast quarter of section 12, all of section 15, all in township 17 north, of range 12 east; retaining in said conveyance a vendor's lien on said lands for the purchase price of five dollars per acre. Canady

paid five hundred dollars of the purchase price, and went into possession of the lands, and began cutting and removing the timber thereon. He made some other small payments to Powell, also paying some back taxes, and failed to make further payments.

In the latter part of the year 1900 T. C. Powell made an assignment of said vendor's lien to his sons, J. H. and T. Cole Powell, and delivered same to Dinning & Bragg, attorneys, in the city of Caruthersville, stating to them that said contract and vendor's lien had been assigned by him to the said parties, and that T. Cole Powell would arrange about making bond for suit if suit should be found necessary. Later, T. Cole Powell called on said attorneys, and suggested that suit should not be brought at that time. It also appears that T. Cole Powell, at that time or later, took the paper out of the possession of said attorneys, went to the office of C. B. Farris, another attorney of the city of Caruthersville, and consulted him about the matter of bringing suit to enforce the lien, and Mr. Farris having informed him that he could not undertake to bring suit for him for the reason that the interests of other clients of his would be affected thereby, he returned the paper to attorneys Dinning & Bragg. Mr. Farris testified that he examined the contract and vendor's lien at the time, that his recollection was that the assignment was in the ordinary form and that the same was properly acknowledged.

On February 13, 1902, defendant L. B. Powell, who was known as Bunk Powell, procured from his father, T. C. Powell, a written assignment of all his right, title and interest in and to the contract and vendor's lien which had previously been assigned by T. C. Powell to the plaintiffs, and at the same time procured from him a quitclaim deed to all the lands mentioned in said contract. As to this transaction the testimony of A. P. Campbell and his wife, who were living at the time with T. C. Powell, was to the

following effect: Bunk Powell came to see the old man two or three times for the purpose of purchasing this contract and vendor's lien from him. The old man explained to him that he had already assigned the contract and lien to his sons, J. H. and T. Cole Powell, and that he could not assign the same to him except subject to their approval, or unless he could procure the paper from them. To this Bunk replied, "All right; I can get it from them myself." Campbell drew up the assignment and deed, and his understanding was that Bunk was to pay the old man $2,250 as consideration therefor, but he did not know 'whether he ever paid that sum. He did know, however, that Bunk afterwards gave the old man some horses, mules and old wagons. On being asked if he was present when the papers were signed and delivered to Bunk by his father, witness Campbell replied, "No, sir; the old man was very ill at the time this trade was made, and Bunk rode off to get a notary—drove off in a run nearly—and he got back there, and they got it signed up some time that night." In the course of a conversation between Campbell and Bunk a few weeks after the trade was consummated Bunk informed witness that J. R. Brewer and J. J. Williams, defendants herein, were interested with him in the trade, and remarked, "I am out nothing; Mr. Williams puts up so much money and Mr. Brewer does the lawing, and I get one-half of what we get out of it." Campbell had a conversation also with T. C. Powell after the assignment to Bunk, and the old man remarked that Bunk was buying against chances, and that if he did not get the papers from the other parties, he was out. Mrs. Annie Campbell, wife of witness A. F. Campbell, testified that at the time the deal was made the old man told Bunk Powell that he would assign the lien to him if he would obtain from T. Cole and J. H. Powell their interest in it. She copied the written assign-

ment to Bunk Powell in a book at T. C. Powell's house. Other testimony showed that after the death of T. C. Powell, which occurred in August, 1903, Bunk Powell had charge of all his books and papers, and that before this trial the leaves of the book containing said copy of the assignment had been torn out.

With reference to the transaction with his father, Bunk Powell testified that he paid his father, as consideration for the assignment to him of the lien, $500 in cash, also delivered to him six horses, one mule, a log wagon outfit, a road wagon, and paid $104 on a note owing by him. In all, he paid him $1,550, or its equivalent. He further testified that it was his understanding that the assignment to Cole and J. H. Powell was merely for the purpose of collecting the debt secured by the lien, and that they were to get ten per cent of the amount collected; that after the assignment to him, J. H. Powell wrote him a letter in which he offered to sell him his interest in the contract and lien for $500. This letter, however, was not produced by the witness.

Upon procuring said assignment from his father, Bunk Powell went to the office of Dinning & Bragg and stated that he had made a trade with his father and that his father sent him for the contract and vendor's lien which had been assigned to T. Cole and J. H. Powell, whereupon he was given possession of the papers. Thereafter, on April 4, 1902, he transferred and assigned to his codefendants, J. R. Brewer and J. J. Williams, for a consideration of $2,000, a forty-eighty-third interest in the debt and vendor's lien assigned to him. Suit was then instituted by the defendants in the Pemiscot Circuit Court to enforce the vendor's lien against the lands in question, said suit being styled "L. B. Powell, J. R. Brewer and J. J. Williams vs. J. W. Canady and William Hunter." Trial was had on the 1st day of August, 1903, and judgment in the sum of $16,275.50 rendered in favor

of the plaintiffs, defendants herein, which judgment was declared to be a lien upon said lands and the lands ordered sold, in obedience to which order the sheriff of Pemiscot county, at the next term of said court, sold the lands to satisfy said judgment, J. R. Brewer becoming the purchaser thereof for himself and codefendants; but he paid to the sheriff only a sum sufficient to pay the costs of suit and the sheriff's fee for selling, the balance of the purchase price being credited on the judgment. It appears that after Canady purchased the land from T. C. Powell, as above mentioned, he sold the west half of section 13, in township 17, range 12, to Wm. Hunter, one of the parties defendant in said suit, who appealed from the judgment in said cause as affecting the said west half of section 13, claimed to be owned by him. This half section was, therefore, not sold at the foreclosure sale, but all the balance of the land was sold by the sheriff and bought in by J. R. Brewer, and the same was held by him for himself and his codefendants at the time of the trial of this cause.

Defendant J. R. Brewer testified that he had no knowledge that T. Cole and J. H. Powell had any interest in the property or lien until after the 4th day of April, 1902, when the forty-eighty-third interest in the lien was purchased by himself and Williams; and Williams, in his own behalf, testified to the same effect.

Samuel J. Corbett, an attorney, testified for plaintiffs that in the fall of 1901 or spring of 1902 he had a conversation with defendant Brewer with reference to some trouble which Brewer had had with Canady respecting the land in controversy, during the course of which conversation Brewer said that in order to get even with Canady he would get Bunk Powell to buy the contract and vendor's lien from old man Powell, and he would then break Canady up; that witness remarked, "That will do you no good, because the

contract has already been assigned to Bud and Cole Powell," whereupon Brewer said that didn't make any difference, as they had never paid a thing for it. Brewer, on the witness stand, denied that he had ever had any conversation with witness Corbett such as related by him.

A transcript of the testimony of T. Cole Powell and J. H. Powell taken in the case of L. B. Powell, J. R. Brewer and J. J. Williams vs. J. W. Canady and Wm. Hunter, wherein they appeared as witnesses, was introduced in evidence in this case by the defendants. This showed that J. H. Powell, while being examined touching his interest in the vendor's lien in question, testified as follows:

"Q. What did you and your brother Cole pay for this—anything? A. No, sir. Q. What were you to pay for it? A. We were just simply to take it and collect it, and we were to get twenty per cent. Q. You never attempted to collect it? A. The reason we didn't, he asked us to wait."

T. Cole Powell's testimony, as shown by said transcript, was as follows:

"Q. You never paid T. C. Powell anything on this? A. No, sir. Q. You simply was to get part for collection? A. He didn't say what, just handed it over for value received. Q. You didn't pay anything, and wasn't to get anything except what you get out? A. That part was not explained to me. Q. You simply was to collect for part of it? A. Nothing was said about that."

As explaining his testimony aforesaid, J. H. Powell testified at the trial of this cause as follows:

"Q. You testified in the case of L. B. Powell et al. vs. Canady et al., in Pemiscot county? A. Yes, sir.

"Q. I will ask you if your testimony in that case relative to holding this contract for collection or otherwise—did you testify relative to that? A.

Yes, sir; I think that is the way the deposition read.

"Q. Now, state fully what you meant at that time? A. When the paper was given to us, or assigned to us, it was a present, and afterwards father complained that he was doing too much for us, and then insisted we keep it for collection.

"Q. Was T. Cole Powell, your brother, present at any time during the conversation with your father in which the matter of that assignment was brought up? A. No, sir, I don't think he was.

"Q. I will ask you what you was to receive out of this matter? A. He said at first that he gave it to us, and the last time we talked about it he agreed he would pay us twenty per cent for collecting it—for attorney's fees and trouble—and would divide the balance equally with me and Cole.

"Q. Your father first maade a straight-out assignment to you and your brother, and it became your property? A. Yes, sir.

"Q. And afterwards, feeling that he had given you quite a little sum, when the amount was collected he thought you ought to give him something back out of it? A. Yes, sir.

"Q. I will ask you if T. Cole Powell ever consented to this agreement you speak of between your father and you? A. No, sir.

"Q. He knew nothing of it? A. No, sir."

After hearing all the evidence, it was adjudged and decreed by the court that the quitclaim deed from T. C. Powell to L. B. Powell be cancelled, set aside and for naught held, and that all of the right, title, interest and claim of whatsoever kind or nature of the defendants in and to the lands in controversy be divested out of them and invested in the plaintiffs; also that all the right, title and interest of the defendants in and to the judgment rendered in their favor and against J. W. Canady and William Hunter by the circuit court of Pemiscot county, on the 28th day of

November, 1903, be divested out of them and invested in the plaintiffs in this cause. The defendants duly filed motion to set aside the finding, judgment and decree of the court, and to grant them a new trial, also a motion in arrest of judgment, both of which motions having been overruled, defendants appealed to this court.

Defendants' first insistence is that the transaction between T. C. Powell and his sons, T. Cole Powell and J. H. Powell, with reference to the contract involving the vendor's lien, amounted to nothing more than an agreement to have them collect said cause of action, and that said agreement could have been revoked at any time, there having been no stipulation as to the length of time they might hold said claim for collection. If the facts in evidence supported that theory of the case, then, as plaintiffs concede, the contention as to the right to revoke would have been correct, but plaintiffs insist that the evidence not only does not support such contention but is all the other way. The chancellor's finding on this issue was in favor of the plaintiffs, and his finding was well supported by the evidence.

The next contention of defendants is that defendant L. B. Powell bought said contract in good faith, and sold to defendants Brewer and Williams in good faith, and that they became the owners of all the interest of T. C. Powell in the contract. The evidence, we think, clearly shows that L. B. Powell was not a purchaser in good faith. He himself testified that he learned of the claim of T. Cole Powell and J. H. Powell before the deed to him was signed and acknowledged, at which time he paid his father four hundred dollars, having previously paid him one hundred dollars on the contract; that before the transaction was consummated he told Brewer of the claim of T. Cole and J. H. Powell, and that Brewer advised him to go ahead and make the deal. It is, therefore, clear that he was

not an innocent purchaser, and that he paid the money to T. C. Powell with full knowledge of the plaintiffs' claim. While L. B. Powell testified that T. Cole Powell told him they were only holding the vendor's lien for collection, he admitted, on cross-examination, that T. Cole Powell did not say that, but that he simply said, "There is nothing in it." The testimony of A. P. Campbell, Annie Campbell, C. E. Bragg and S. J. Corbett all goes to show that the purchase was not made in good faith, or without notice of plaintiffs' claim. It plainly appears that T. C. Powell, having previously assigned all his right, title and interest in and to said vendor's lien to J. H. and T. Cole Powell, had no interest to assign to L. B. Powell, and it must needs be that nothing passed by such assignment.

It is also claimed by defendants that the plaintiffs knew of the purchase, but made no claim to the lands or any interest therein until after the defendants had obtained the judgment against Canady on the contract, and that they now seek to appropriate that judgment to their own use. This, if anything, is a plea of estoppel; but there is no element of estoppel in the case. While T. Cole Powell and J. H. Powell claimed to be the owners of this vendor's lien at the trial between these defendants and J. W. Canady, they were not parties to that suit, did not cause the defendants to change their position, and did not in any way mislead them.

Defendants also contend, that, "If respondents have any title to or interest in that contract, or any rights thereunder, they should assert them against the land in a suit against Canady and the others interested in said lands." In view of the fact that defendants had already seized upon and sold this land for the payment of this same debt, we are unable to appreciate the force or merit, or even the plausibility, of such contention. To say the least, the manner of the at-

tempt on the part of the defendants to obtain the title to this land is not to be commended. In the case of Waddington v. Lane, 202 Mo. 387, wherein the facts were very similar to those in the case at bar, the court divested the title to the property in dispute out of the party obtaining the same through fraud, and vested the title in the party justly entitled thereto, just as was done by the trial court in this case.

Defendants further insist that, "If the court had any power to set aside the deed from T. C. Powell to L. B. Powell, it could not undertake to project the title over and into T. Cole Powell and J. H. Powell, as they never claimed to have any deed; that if the court had any power to hold that defendants herein should not have obtained judgment against Canady and others, it did not have any power to transfer that judgment, improperly obtained, to T. Cole Powell and J. H. Powell, and that if it had the power to ascertain and decree that T. Cole Powell and J. H. Powell were the lawful owners of the contract with Canady, that is all that it could decide." As to the first proposition, the defendants are evidently mistaken. The court did not hold that plaintiffs derived any title by or through the quitclaim deed from T. C. Powell to L. B. Powell, but that deed was by the decree of the court set aside and for naught held, and the court gave the plaintiffs the full benefit of the judgment theretofore obtained by defendants herein in their suit against Canady et al., in doing which it acted within the jurisdiction and bounds of a court of equity. In Baker v. McDaniel, 178 Mo. l. c. 474, Judge Fox, speaking for the court, said: "The rule that a court of equity, after once acquiring jurisdiction of a cause, will do complete justice and grant full relief, means that the court, keeping in view the purpose of the action, will reach out and adjust all equities necessary to give force and effect to the decree and remedy the evil sought to

be corrected by the action.'' In the case of Evans v. Railroad, 64 Mo. l. c. 462, the court said: ''A court of equity, owing to the flexibility of its powers, is not confined to a single method of affording redress, but will, as just seen, adopt that method of administering relief as will, without circuity of action, compel the party in default to do equity.''

Another insistence of defendants is that the circuit court had not power or jurisdiction to render this judgment, and could not have, unless and until the administrator of J. W. Canady, and the heirs of J. W. Canady, as well as William Hunter, were made parties to the suit. We cannot admit this contention. Canady and Hunter had each had his day in court, trial of the issues was had, with all parties represented, and Hunter appealed from the judgment rendered against him. Neither Canady's nor Hunter's interests were affected by this litigation. The cause of action against Canady and Hunter which the defendants, through fraud, procured from T. C. Powell, and upon which they obtained judgment against Canady and Hunter, was plaintiffs' cause of action; and inasmuch as defendants have already brought suit upon that cause of action, and obtained judgment against Canady and Hunter, it would be an act of injustice as to the latter to set aside all the proceedings and put them to the additional and unnecessary expense of defending a new suit instituted against them by the plaintiffs, when such can be avoided, and complete justice done, now that all the necessary parties are before the court, by divesting the judgment obtained by these defendants out of them, and vesting said judgment in these plaintiffs, for whom, as it were, they hold it in trust. It is of no consequence to Canady or Hunter who has the right to enforce and collect this judgment. So far as this record discloses, neither of them has any interest in this litigation, nor are they, or either of them, here complaining. Besides, if the defendants believed

it necessary, they could have made Canady and Hunter parties to this action, which, however, they did not choose to do.

Defendants further say, "There was and is no warrant in law for the attempted subrogation of respondents to the rights of appellants herein in and to the judgment obtained by appellants against Canady." What we have already said is a sufficient answer to the proposition here intended to be stated. This is not a question or matter of either legal or conventional subrogation, nor was the case tried upon any such theory, nor does the word "subrogation" occur anywhere in the court's decree.

The findings of the court were in accordance with the evidence, and the decree is eminently right and just. The judgment is affirmed. All concur.